IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CONNECT INSURED TELEPHONE, INC. | § § § | |
| Plaintiff, | § § § | |
| VS. | § § | NO. 3-10-CV-1897-D |
| QWEST LONG DISTANCE, INC., ET AL. | § § § § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Connect Insured Telephone, Inc. ("CIT") has filed a motion to compel discovery from Defendants Qwest Long Distance, Inc. and Qwest Communications Company, LLC ("Qwest") in this civil action removed from state court to federal court on the basis of diversity of citizenship. For the reasons stated herein, the motion is denied.

I.

A brief overview of the facts of the case and the claims of the parties is necessary to the disposition of the pending motion. CIT is a competitive local exchange carrier that provides local telephone service to customers in Texas. (*See* Def. Ans. to Plf. Am. Compl. at 17, ¶ 6). Qwest is a nationwide telecommunications company that provides domestic long distance telephone service to customers throughout the country. (*Id.* at 17, ¶ 5). When Qwest carries long distance calls to customers within CIT's local calling area, it must use CIT's network facilities to connect the calls. (*See* Plf. Am. Compl. at 2, ¶ 6). Use of CIT's facilities in this way is referred to as "switched access" services, and obligates Qwest to pay "access charges" to CIT. (*See id.*; Def. Ans. to Plf. Am. Compl.

at 19-20, ¶¶ 15-16. Such "access charges" are regulated by tariffs on file with the Federal Communications Commission ("FCC") and the Texas Public Utilities Commission ("PUC"). (*See* Def. Ans. to Plf. Am. Compl. at 19-20, ¶ 16).

At issue in this lawsuit are toll-free long distance calls, or calls to 1-8xx numbers, for which the originating customers do not pay any fees. (*See* Plf. Am. Compl. at 2, ¶¶ 6-7; Def. Ans. to Plf. Am. Compl. at 19, ¶ 15). When a customer places a 1-8xx call, the local exchange carrier performs a "database dip," which queries a 1-8xx database to identify the long distance carrier responsible for carrying the call to that number. (*See* Def. Ans. to Plf. Am. Compl. at 20, ¶ 17). The local exchange carrier then routes the 1-8xx call to the appropriate long distance carrier, who pays the originating local exchange carrier a "switched access" charge that includes a charge for the "database dip." (*Id.* at 20, ¶¶ 18-19). If the call is answered, the owner of the 1-8xx number reimburses the long distance carrier for these charges. (*Id.*). If the call is not answered, the owner of the number is not billed by the long distance carrier. (*Id.*). In this lawsuit, CIT alleges that Qwest owes approximately $250,000 for database queries for 1-8xx numbers dating back to December 2008. (*See* Plf. Am. Compl. at 2-4, ¶¶ 6, 8, 11, 14, 26). Qwest counters that the charges are not legitimate because CIT engaged in an unlawful "traffic pumping" scheme, whereby autodialers place millions of 1-8xx calls to random numbers, but disconnect the calls before they are answered. (*See* Def. Ans. to Plf. Am. Compl. at 20, ¶ 20). According to Qwest, "switched access" charges apply only to calls originating from an "end-user" at a "premises" unique to the user. (*See id.* at 21-23, ¶¶ 27, 29, 35, 38-39). Because the autodialers are not "end-users" and are located on CIT's premises, Qwest maintains that it is not required to pay "switched access" charges for autodialed calls. (*Id.* at 24-25, ¶¶ 43-45).

The instant discovery dispute involves two interrogatories and 12 document requests served on Qwest.[1] The two interrogatories seek:

- the amount of charges Qwest billed for CIT customers each month for the period beginning June 1, 2007 to December 31, 2009, and the amount of revenue Qwest received from CIT customers during those months (Interrog. #10); and

- information regarding all "Call Centers" owned and/or operated by Qwest from January 1, 2006 to the present, including the name and address of each Call Center and contact information for the manager of the Call Center (Interrog. #17).

The document requests seek:

- documents that show, list, or account for calls made from telephone numbers assigned to CIT for the period beginning June 1, 2008 to the present (RFP #8);

- documents and electronic data that show, list, or account for financial or payment data for calls made from telephone numbers assigned to CIT for the period beginning June 1, 2008 to the present, including long distance charges, payments, refunds, credits, late payments, and disputed payments (RFP #11, 12, 13, 14, 15 & 16);

- documents and electronic data that show, list, or account for payments to Qwest affiliates for 1-8xx calls that originated from call centers for the period beginning June 1, 2008 to the present (RFP #17);

- internal audits and related documentation performed by Qwest regarding 1-8xx call traffic with CIT for the period beginning June 1, 2007 to the present (RFP #42);

- documents and electronic data that relate to, summarize, or reflect ledgers, statements, and accounts for 1-8xx calls with

---

[1] One of the defendants, Qwest Long Distance, Inc. ("QLD"), has not operated as an interexchange carrier or competitive local exchange carrier in Texas since 2003, and has no information or documents responsive to any of the discovery requests. (*See* Jt. Stat. Rep. at 5). As a result, Qwest has answered the requests as if they were directed to the other defendant, Qwest Communications Company, LLC ("QCC"), which is the certificated long distance carrier in Texas. (*Id.*).

> CIT for the period beginning June 1, 2007 to the present (RFP #43);
>
> - documents that relate to the volume of traffic for 1-8xx calls originating with CIT and terminating with Qwest subscribers, including all call detail records, CABS billing records, logfiles, call collection information, and call detail information (RFP #52); and
>
> - documents about any Qwest call center or outbound calling product, including enhanced call routing, predictive dialing services, and other services sold to call centers (RFP #59).

Qwest objects to these discovery requests as irrelevant, overly broad, and unduly burdensome. In addition, Qwest contends that some 300 documents withheld from production are privileged or otherwise exempt from discovery. The parties have briefed their respective positions a Joint Status Report filed on August 31, 2011, and the motion is ripe for determination.

II.

Rule 26(b) allows a party to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" FED. R. CIV. P. 26(b)(1). The information and materials sought need not be admissible at trial "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Relevant information includes "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. 2005), *quoting Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978). In the discovery context, "[r]elevancy is broadly construed, and a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party." *Id., quoting Sheldon v. Vermonty*, 204 F.R.D. 679, 689 (D. Kan. 2001). Once the moving party establishes that the information and materials sought are within the scope of permissible

discovery, the burden shifts to the nonmovant to show why the discovery is irrelevant, overly broad, unduly burdensome, or should not be permitted. *See SSL Services, LLC v. Citrix Systems, Inc.*, No. 2-08-CV-158-TJW, 2010 WL 547478 at *2 (E.D. Tex. Feb. 10, 2010), *citing Spiegelberg Mfg., Inc. v. Hancock*, No. 3-07-CV-1314-G, 2007 WL 4258246 at *1 (N.D. Tex. Dec. 3, 2007).

A.

The documents responsive to RFP Nos. 8, 11, 12, 13, 14, 15, 16, 17, 43 and 52 consist of call detail records, or "CDRs." (*See* Jt. Stat. Rep. at 16-18, 21, 33-44). A CDR is a computer-generated record that is created when a long distance call is made. The CDR contains certain information regarding the call, including the originating telephone number, the number dialed, and the length of the call. (*See* Jt. Stat. Rep. App. at 325, ¶ 6 & *id.* at 78, ¶ 8). In most cases, special equipment and software are required to analyze a CDR. (*See id.* at 325, ¶ 7 & *id.* at 78-79, ¶ 8). Because there are millions of disputed calls at issue in this case, there are millions of CDRs responsive to CIT's document requests. (*See id.* at 325, ¶ 8). Among other things, Qwest contends that it would be unduly burdensome and oppressive to gather and analyze the CDRs.

Rule 26(b)(2)(C) requires a court to limit otherwise permissible discovery if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

FED. R. CIV. P. 26(b)(2)(C). *See also Crosby v. Lousiana Health Service and Indemnity Co.*, 647 F.3d 258, 264 (5th Cir. 2011) (district court must limit proposed discovery if it determines that the burden or expense of the discovery outweighs its likely benefit). In a sworn declaration, Christopher Inman, Director of Finance for Qwest, explains that CDRs are archived on magnetic tapes housed off site. (*See* Jt. Stat. Rep. App. at 326, ¶ 9). The CDRs for the calls at issue are interspersed on tapes with CDRs for billions of other calls that Qwest carries each year. (*Id.* at 326, ¶¶ 10, 11). According to Inman, it would take "hundreds if not thousands of hours" and "tens of thousands of dollars" to gather the CDRs and have TEOCO, a third-party vendor, use specialized tools to parse the responsive CDRs from the billions of other CDRs archived in its warehouse. (*Id.* at 325-26, ¶¶ 7-8, 11). Inman states that every telephone company that bills switched access, including CIT, "must have access to a company that generates and maintains CDRs on their behalf." (*Id.* at 326, ¶ 13). Indeed, it appears that CIT previously provided Qwest with CDRs for at least some of the disputed calls at issue in this lawsuit. (*See id.* at 206-07, 350). Inman suggests that it would be "substantially easier and more cost effective" for CIT to gather the same CDRs from its own billing agent because CIT handles a significantly lower volume of calls than Qwest. (*See id.* at 326, ¶ 13).

CIT does not deny any of these facts. Nor does it offer any evidence to controvert Inman's sworn testimony that it would take "hundreds if not thousands of hours" and "tens of thousands of dollars" to obtain the relevant CDRs. Instead, CIT merely asserts that "[t]he alleged burdensome nature of the request is overblown and exaggerated" because Qwest is a multi-billion dollar company, the amount in controversy is at least $264,398, and the CDRs are "key" to its claims for unjust enrichment, money had and received, conversion, and exemplary damages. (*See* Jt. Stat. Rep. at 20-21). Notably, CIT fails to explain why it cannot obtain the CDRs from a more convenient, less burdensome source -- namely, its own billing agent. The only evidence before the court on this issue

comes from Inman, who states that it would be "substantially easier and more cost effective" for CIT to gather the CDRs from that other source. The court therefore sustains Qwest's objection to RFP Nos. 8, 11, 12, 13, 14, 15, 16, 17, 43, and 52.[2]

With respect to Interrogatory No. 10, Inman explains that Qwest does not maintain records of the amount of charges billed to or the revenues received from CIT customers. (*See* Jt. Stat. Rep. App. at 327, ¶ 20). The analysis required to determine those charges would involve the review of millions of CDRs on an individual basis. (*Id.* at 327-28, ¶¶ 20-21; *see also* Jt. Stat. Rep. at 2). Additionally, Qwest would need to analyze the calling plan for every individual customer who received one of the 1-8xx calls at issue to determine whether the charges for those calls were disputed and written off. (*See* Jt. Stat. Rep. App. at 327-28, ¶ 21). Inman conservatively estimates that such an analysis would take more than 50,000 hours to perform. (*Id.* at 328, ¶ 24). CIT does not dispute this estimate. Nor does CIT argue that the information requested in Interrogatory No. 10 is relevant to any of its claims other than unjust enrichment, money had and received, conversion, and exemplary damages. (*See* Jt. Stat. Rep. at 4). Even if the requested information is relevant to CIT's equitable claims, *but see Northern Valley Communications, LLC v. Qwest Communications Corp.*, No. 09-1004-CBK, 2010 WL 3672233 at *5 (D.S.D. Sept. 10, 2010) (questioning relevance of long distance carrier's revenues to local carrier's claim for unjust enrichment), the marginal benefit of such discovery does not justify the expenditure of tens of thousands of dollars by Qwest to obtain the information, particularly in a lawsuit where the principal allegations involve breach of contract and the amount in controversy is less than $265,000. That Qwest is a multi-billion dollar company

---

[2] In the Joint Status Report, CIT expresses "doubts" as to whether certain financial information and payment data would be found in CDRs. (*See* Jt. Stat. Rep. at 15). To the extent CIT seeks an order requiring the production of documents other than CDRs, the existence and responsiveness of such other documents has not been adequately briefed by the parties.

does not, in itself, make the discovery any less burdensome. Qwest's objection to Interrogatory No. 10 is sustained.

The court also sustains Qwest's objection to Interrogatory No. 17 and RFP Nos. 17 and 59, which seek information and documents regarding Qwest call centers and outbound calling products. CIT has defined the term "call center" to mean "any business . . . that engages in receiving or transmitting large volumes of requests by way of using telephone lines and/or telephone equipment[.]" (*See* Jt. Stat. Rep. App. at 136). Qwest objects that these discovery requests are irrelevant, vague, ambiguous, and overly broad. (*See* Jt. Stat. Rep. at 12-13, 37-38). In particular, Qwest contends that the term "call center," as defined by CIT, encompasses virtually every Qwest office building and every Qwest business customer because they all receive or send large volumes of requests by way of using telephone lines or telephone equipment. (*See* Jt. Stat. Rep. App. at 330, ¶ 4). With respect to outbound calling products, Qwest maintains that virtually every telecommunications product it sells has the ability to make outbound calls. (*Id.* at 332, ¶ 14). CIT does not deny the breadth of its discovery requests, but refuses to limit the definition of "call centers" to include only "call centers whose primary function is outbound calling."[3] (Jt. Stat. Rep. at 11-12, 36). Instead, CIT argues that the information sought is relevant to its "discriminatory cause of action" under the Texas Public Utility Regulatory Act, Tex. Util. Code Ann. § 55.001, *et seq.* (*See* Jt. Stat. Rep. at 12, 36). Regardless of the relevance of this information, the term "call centers," as defined in the discovery requests, is overly broad.

---

[3] CIT refuses to narrow the definition of this term because it allegedly has learned through "independent research" that Qwest call centers make outbound calls. (*See* Jt. Stat. Rep. at 12). However, CIT does not elaborate on the details of its "independent research" or explain how this information justifies the broad definition of "call centers." To the extent Interrogatory No. 17 and RFP Nos. 17 and 59 seek information about call centers whose primary function is outbound calling, Qwest states that it does not operate any such call centers. (*See* Jt. Stat. Rep. App. at 63).

B.

Finally, the parties dispute whether some 300 documents listed on Qwest's privilege log, which include "internal audits" responsive to RFP No. 42 and some documents responsive to RFP No. 43, constitute work product.[4]

The federal work product doctrine, as codified in Fed. R. Civ. P. 26(b)(3), provides for the qualified protection of documents and tangible things prepared by or for a party or that party's representative "in anticipation of litigation or for trial." FED. R. CIV. P. 26(b)(3).[5] Determining whether a document is prepared in anticipation of litigation is a "slippery task." *Mims v. Dallas County*, 230 F.R.D. 479, 483 (N.D. Tex. 2005), *citing United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982), *cert. denied*, 104 S.Ct. 1927 (1984). A document need not be generated in the course of an ongoing lawsuit in order to qualify for work product protection. *Id.* However, "the primary motivating purpose" behind the creation of the document must be to aid in possible future litigation. *In re Kaiser Aluminum & Chemical Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 1354 (2001); *United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir.), *cert. denied*, 102 S.Ct. 320 (1981). As the advisory committee notes to Rule 26(b)(3) make clear, "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." FED. R. CIV. P. 26, adv. comm. notes; *see also El Paso Co.*, 682 F.2d at 542. Among the factors relevant to determining the primary motivation for creating a document are "the retention

---

[4] Qwest also contends that many of these documents are privileged attorney-client communications. In view of the determination that all the withheld documents constitute work product, the court need not consider whether the attorney-client privilege applies.

[5] Work product is not a substantive privilege within the meaning of Fed. R. Civ. P. 501. *See Interphase Corp. v. Rockwell International Corp.*, No. 3-96-CV-0290-L, 1998 WL 664969 at *4 (N.D. Tex. Sept. 22, 1998). Therefore, the resolution of this issue is governed by federal law.

of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D. Tex. 2004), *quoting Electronic Data Systems Corp. v. Steingraber*, No. 4-02-CV-225, 2003 WL 21653414 at *5 (E.D. Tex. Jul. 9, 2003). If the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation. *Id.*

Like all privileges, the work product doctrine must be strictly construed. *Mims*, 230 F.R.D. at 484; *see also McCook Metals L.L.C. v. Alcoa, Inc.*, 192 F.R.D. 242, 260 (N.D. Ill. 2000) (work product doctrine "significantly restricts the scope of discovery and must be narrowly construed in order to aid in the search for the truth"); *Republican Party of North Carolina v. Martin*, 136 F.R.D. 421, 429 (E.D.N.C. 1991) (same). The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial. *See Mims*, 230 F.R.D. at 484. A general allegation of work product is insufficient to meet this burden. *See Nagivant Consulting*, 220 F.R.D. at 473, *citing Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985). Instead, "a clear showing must be made which sets forth the items or categories objected to and the reason for that objection." *Id., quoting Caruso v. Coleman Co.*, No. 93-CV-6733, 1995 WL 384602 at *1 (E.D. Pa. Jun. 22, 1995). The proponent must provide sufficient facts by way of detailed affidavits or other evidence to enable the court to determine whether the documents constitute work product. *Id.* Although a privilege log and an *in camera* review of documents may assist the court in conducting its analysis, a party asserting the work product exemption still must provide "a detailed description of the materials in dispute and state specific and precise reasons for their claim of protection from disclosure." *Id.* at 473-74,

*quoting Pippenger v. Gruppe*, 883 F.Supp. 1201, 1212 (S.D. Ind. 1994). In fact, "resort to *in camera* review is appropriate only *after* the burdened party has submitted detailed affidavits and other evidence to the extent possible." *Id.* at 474, *quoting Caruso*, 1995 WL 384602 at *1 (emphasis in original).

Judged against this standard, Qwest has met its burden of proving that the documents at issue are entitled to work product protection. In addition to a detailed privilege log identifying each document withheld from production and the reasons therefor, Qwest provides the sworn declaration of its Associate General Cousnel, Thomas M. Dethlefs, who explains:

> Qwest began analyzing evidence concerning Connect IT in late 2008. Initially, the Facilities Cost organization found Connect IT's calling patterns aberational. Shortly thereafter, they came to the Qwest Law Department seeking counsel about how to address the situation. I was the person within the Qwest Law Department that the matter was assigned to for investigation. I began to work with Chris Inman and Doug Hyatt of Qwest Facilities Cost Organization and John Cunningham of Network Security. I asked them to gather material for me because the case appeared to have many aspects similar to those Qwest was confronting in existing litigation pending in Iowa and South Dakota; what is known as "traffic pumping" litigation. Thus, in late 2008, Qwest and I specifically believed that litigation with Connect IT was probable, and began to prepare for that eventuality. At the time, Qwest did not have all of the facts necessary to initiate litigation, but began to conduct itself in anticipation of potential litigation by asking me to investigate and analyze the charges of potential illegality.

(*See* Jt. Stat. Rep. App. at 335-36, ¶ 5). CIT does not dispute any of these facts. Without evidence to suggest otherwise, the court determines that all the documents identified in the privilege log were prepared by or for Qwest "in anticipation of litigation," and thus are protected from disclosure by the work product doctrine. Contrary to CIT's suggestion, a document need not be generated in the course of an ongoing lawsuit in order to qualify for work product protection. *See Mims*, 230 F.R.D. at 483. Nor is there any requirement, at least in the Fifth Circuit, that an attorney add "creative or analytic

input" to a document for it to qualify as work product. *See Navigant Consulting*, 220 F.R.D. at 477 (document is entitled to work product protection if the "primary motivating purpose" behind the creation of the document was to aid in possible future litigation). Accordingly, CIT is not entitled to any of these documents.[6]

## CONCLUSION

Plaintiff's motion to compel discovery [Doc. #93] is denied in its entirety.

SO ORDERED.

DATED: October 6, 2011.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE

---

[6] CIT briefly mentions that the "substantial need exception" to the work product doctrine may allow for discovery of the documents withheld by Qwest. (*See* Jt. Stat. Rep. at 47). Other than this off-hand comment in the Joint Status Report, CIT makes no attempt to satisfy the requirements of Fed. R. Civ. P. 26(b)(3) -- that is, to establish a "substantial need of the materials in the preparation of [its] case and that [it] is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *See Mims*, 230 F.R.D. at 484, *quoting* FED. R. CIV. P. 26(b)(3).