IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CONNECT INSURED TELEPHONE,      §
INC.,                           §
                                §
        Plaintiff-counterdefendant,   §
                                §   Civil Action No. 3:10-CV-1897-D
VS.                             §
                                §
QWEST LONG DISTANCE, INC.,      §
                                §
        Defendant-counterplaintiff.   §

MEMORANDUM OPINION
AND ORDER

      This lawsuit arises from a billing dispute between telecommunications companies—a

competitive local exchange carrier ("CLEC") and an interexchange carrier ("IXC").  The

IXC moves for summary judgment on its counterclaims for violations of §§ 201(b) and 203

of the Communications Act, breach of contract, unjust enrichment, money had and received,

and declaratory judgment, and for summary judgment on the CLEC's claims for breach of

contract, violations of the filed rate doctrine and Public Utility Regulatory Act, unjust

enrichment, money had and received, quantum meruit, conversion, attorney's fees,

exemplary damages, and consequential damages.  For the reasons that follow, the court

grants the summary judgment motion in part and denies it in part.

I

Plaintiff-counterdefendant Connect Insured Telephone, Inc. ("Connect") is a CLEC[1] that provides local exchange telephone services in the state of Texas. Defendant-counterplaintiff Qwest Communication Company, LLC f/k/a Qwest Communication Corporation ("Qwest")[2] is an IXC that provides various telecommunications services nationwide, including long distance calling services.[3] Connect brought this lawsuit against Qwest in state court alleging claims for breach of contract, violations of the filed rate doctrine and Public Utility Regulatory Act, unjust enrichment, money had and received, quantum meruit, conversion, and attorney's fees. Qwest removed the case to this court and asserted counterclaims against Connect and CIT Telcom Management, Inc. ("CIT") for violations of §§ 201(b) and 203 of the Communications Act, breach of contract, conversion, unjust enrichment and money had and received, violations of the Texas Automatic Dial Announcing Devices Statute, and declaratory judgment.

A telephone call is traditionally classified as a local call or a long distance call. Local

---

[1]CLECs differ from incumbent local exchange carriers ("ILECs"). ILECs are the traditional providers of local exchange services, while CLECs are new entrants into the market that compete with ILECs.

[2]Defendant Qwest Long Distance, Inc. was dismissed by stipulation on March 23, 2012.

[3]"Where the facts are materially disputed, the court recounts the evidence in a light favorable to the nonmovant on that issue and draws all reasonable inferences in favor of the nonmovant." *Mid–Continent Cas. Co. v. Eland Energy, Inc.*, 2009 WL 3074618, at *1 n.4 (N.D. Tex. Mar. 30, 2009) (Fitzwater, C.J.) (citing *Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 617 n.2 (N.D. Tex. 2007) (Fitzwater, J.)), *appeal docketed*, No. 11-10649 (5th Cir. July 8, 2011).

calls originate and terminate within the same local calling area, often referred to as an exchange.  A local exchange carrier ("LEC") typically serves customers in an exchange. Long distance calls are carried by an IXC, such as Qwest, from the originating exchange to the terminating exchange.  A CLEC, such as Connect, provides switched access services to IXCs pursuant to filed access tariffs[4] or contracts with individual IXCs.  IXCs pay LECs origination and termination switched access charges when one of their customers calls an end user in the LECs' local exchange.  LECs cannot charge a calling party if the call is made to a toll-free number; instead, when a toll-free call is placed, a database is queried that matches the toll-free number to the long distance carrier responsible for that number.  The responsible long distance carrier is then billed by the originating LEC for the switched access charges.

Initially, Qwest paid Connect's bills for switched access services.  Qwest stopped paying Connect's bills in December 2008 due to allegedly suspicious traffic and billing patterns.  Connect informed Qwest that the calls were being made from legitimate call centers and demanded payment.  Eventually, Connect brought this lawsuit against Qwest for the amount of the unpaid bills.  Qwest asserts various counterclaims in an attempt to recoup amounts previously paid to Connect that it alleges should not have been charged.  Qwest moves for summary judgment on several of its counterclaims and on all of Connect's claims.

---

[4]Tariffs must be filed with the relevant state agency for intrastate calls and with the Federal Communications Commission for interstate calls.

II

When a party moves for summary judgment on a claim for which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of evidence of any essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the opposing party must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the opposing party fails to meet this burden. *Little*, 37 F.3d at 1076.

When a party moves for summary judgment on a claim on which it will have the burden of proof at trial, the party "must establish 'beyond peradventure all of the essential elements of the claim[.]'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F.Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that the moving party must demonstrate that there are no genuine and material fact disputes and that the party is entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003).

- 4 -

"The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

III

The court turns initially to the part of Qwest's motion for summary judgment that is addressed to Qwest's counterclaims.  The court begins with the counterclaim for relief under §§ 201(b) and 203 of the Communications Act.[5]

A

Section 201(b) of the Communications Act makes unlawful "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service . . . that [are] unjust or unreasonable."  47 U.S.C. § 201(b).  One method of proving that a charge is unjust or unreasonable is to show that it violates a Federal Communications Commission ("FCC") rule or regulation implementing § 201(b)'s prohibition on unreasonable charges and practices.  *See Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 54-55 (2007) ("[T]he FCC has long implemented § 201(b) through the issuance of rules and regulations.").

Section 203(a) of the Communications Act "requires common carriers to submit schedules showing 'all charges' and 'the classifications, practices, and regulations affecting

---

[5]The court need not reach Qwest's counterclaim under § 203.  *See infra* note 14.

- 5 -

such charges.'"  *AT&T Corp. v. YMAX Commc'ns Corp.*, 26 F.C.C.R. 5742, 5748 (2011) (quoting 47 U.S.C. § 203(a)).  The FCC no longer requires that all CLECs file tariffs with the FCC; instead, "CLECs have been allowed to assess interstate switched exchange access service charges upon IXCs either by filing tariffs with the Commission or by negotiating contracts with the affected IXCs."  *In re Sprint Commc'ns Co. v. N. Valley Commc'ns, LLC*, 26 F.C.C.R. 10780, 10782 (2011) ("*N. Valley II*").  *See also In re Qwest Commc'ns Co. v. N. Valley Commc'ns, LLC*, 26 F.C.C.R. 8332, 8335 (2011) ("*N. Valley I*") ("In contrast to [incumbent local exchange carriers], CLECs may impose interstate access charges either through tariffs or contracts negotiated with IXCs.").[6]  A CLEC may file a tariff if charging switched access rates below an FCC-established benchmark, but must negotiate contracts with IXCs to charge switched access rates above the benchmark.  *See N. Valley I*, 26 F.C.C.R. at 8335; *see also* 47 C.F.R. § 61.26.  If a CLEC does not have a filed tariff or a contract with the relevant IXC, it cannot collect switched access charges.  *Id.* at 8335-36 (holding that Northern Valley violated § 201(b) because its tariff violated the FCC's access charge rules, precluding Northern Valley from assessing switched access charges under the tariff); *see also Hypercube LLC v. Comtel Telcom Assets LP*, 2009 WL 3075208, at *4(N.D. Tex. Sept. 25, 2009) (Fish, J.) (holding that LEC could not collect switched access charges

---

[6]Although the court is not obligated to defer automatically to the FCC's construction of the Communications Act, the court should defer to the interpretation of any ambiguous language unless the interpretation is arbitrary and capricious. *See, e.g., Hancock v. Chi. Title Ins. Co.*, 635 F.Supp.2d 539, 548 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)), *aff'd sub nom. Benavides v. Chi. Title Ins. Co.*, 636 F.3d 699 (5th Cir. 2011).

without valid tariff). A CLEC therefore violates § 201(b) by charging an IXC switched access charges that are not billed pursuant to a filed tariff or a negotiated contract, because such charges are unjust and unreasonable.

Qwest argues that because Connect does not have an interstate tariff on file with the FCC or a negotiated contract with Qwest, Connect's billing of Qwest for switched access services constituted an unjust or unreasonable charge, in violation of 47 U.S.C. § 201(b). Connect avers that there is a genuine issue of fact as to whether it filed an interstate tariff with the FCC. Connect also maintains that it was not required to file a tariff with the FCC; Qwest did not follow the correct procedures for challenging Connect's bills; the filed rate doctrine requires Qwest to pay for the switched access charges; and Qwest constructively ordered Connect's services and therefore must pay for them. Qwest responds that Connect would have been excused from filing a tariff with the FCC only if Connect had negotiated a contract with Qwest, which it did not. Furthermore, Qwest argues that the filed rate doctrine and the constructive ordering doctrine apply only to *filed* tariffs. Last, Qwest contends that it has established beyond peradventure that Connect did not file its interstate tariff with the FCC or enter into a contract with Qwest.

B

To decide whether Qwest is entitled to summary judgment holding that Connect is liable on Qwest's counterclaim under § 201(b) of the Communications Act, the court must determine whether Qwest has established beyond peradventure that Connect did not file an interstate tariff with the FCC.

- 7 -

Qwest has adduced evidence to support its contention that the tariff was not filed.

First, Connect's agent, Leo Wrobel ("Wrobel"),[7] told Qwest that "[a]s [he] suspected, there

is no FCC tariff for [Connect]," and "[he] believe[s] the FCC did away with the requirement

to file them at the federal level several years ago."  D. App. 426.[8]  In an attempt to confirm

Wrobel's statements, Qwest's expert, William R. Easton ("Easton"), was unable to find a

Connect tariff on file with the FCC.[9]  Furthermore, an individual whom Qwest sent to the

FCC filing repository was unable to locate a physical copy of a Connect tariff on file with

the FCC.[10]  Next, Qwest points to statements made by Wrobel that he "can't substantiate the

---

[7]Although Connect initially designated Wrobel as an expert, Connect has since de-designated him; therefore, the court will not consider Wrobel's expert opinions as evidence.

[8]Connect objects to all of Qwest's depositions in their entirety, arguing that because Qwest filed the entire depositions, Connect was impermissibly forced to "sift through the record in search of evidence to support a party's opposition to summary judgment."  *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996).  The court disagrees.  Qwest did not violate this requirement because it cited the specific parts of the record that support its motion for summary judgment.

[9]Connect objects to facts in Easton's expert report on the grounds that they are inadmissible hearsay.  Fed. R. Evid. 703, however, does not require that facts or data relied on by an expert be admissible in order for the expert's opinions to be admissible.  Connect also argues that Easton's expert reports do not qualify under Fed. R. Civ. P. 56(c) as declarations.  Qwest has submitted declarations of Easton, however, that comply with Rule 56(c).

[10]Connect attempts in several ways (all unsuccessful) to discount the fact that Qwest was unable to find a copy of Connect's interstate tariff at the FCC repository.  First, Connect cites statements by Wrobel that a person searching for a physical copy of Connect's tariff may not find it at the FCC because "[t]hey're not only filed at the FCC" and Connect's tariffs "go through a different procedure."  P. Conf. App. 3.  But Wrobel's own statement implies that the tariffs *are* filed with the FCC, even if also filed elsewhere.  Moreover, Wrobel has never personally attempted to locate a tariff filed with the FCC.  Second, Connect cites statements made by Chris Inman ("Inman"), Qwest's Director of Facility Costs, that "there

filings" of the interstate tariff and that he has not personally gone to the FCC to attempt to substantiate its filing.  D. App. 587.  And Connect's President, Troy Guillet ("Guillet"), had no personal knowledge regarding whether the tariff was filed.[11]  Guillet stated that, "to the best of his knowledge," Connect had filed an interstate tariff with the FCC, but he could neither recall what research he did to validate the filing nor remember whether it involved physically going to the FCC to validate the filing.  D. App. 747-48.

Connect cites evidence to demonstrate that it filed its interstate tariff with the FCC.  First, Connect produces an interstate tariff.[12]  The title page states that the "tariff is on file with the [FCC]," and that the tariff became effective on May 20, 2008.  P. App. 1.  Next, Connect cites deposition testimony of Guillet, its President.  When asked if he knew whether Connect's interstate tariff was filed with the FCC, he responded that he "believe[d] that to

_____

is not one defined way of how to locate a tariff." *Id.* at 60.  But Inman was merely describing how there is more than one way for Qwest to find a tariff for the purposes of selecting a vendor, not that there are several ways to locate a particular tariff, some of which may not be successful.  Third, Connect makes various assertions about the accuracy of the FCC's tariff tracking and filing system, but these assertions are unsupported by any evidence. Qwest's evidence concerning Connect's interstate tariff therefore remains substantiated based on the summary judgment record.

[11]Connect objects to the June 15, 2011 deposition of Guillet on the grounds that it was not certified and that it was later corrected or modified by an errata sheet.  But the deposition transcript *was* certified.  *See* D. App. 744.  And even if Guillet's deposition was later corrected or modified, this does not render the deposition inadmissible.  *See Reilly v. TXU Corp.*, 230 F.R.D. 486, 490 (N.D. Tex. 2005) (Ramirez, J.) (holding that both the original deposition and the modified or correct deposition are admissible).

[12]In response to Qwest's request that Connect admit that it did not file an interstate tariff with the FCC between 2000 and 2010, Connect denied the request and cited its tariff as the evidence demonstrating that it was filed.

be the case."  P. Conf. App. 96.  But Guillet "believe[d]" that it had been filed because he was told so, but he could not recall who told him.  Moreover, Guillet acknowledged that he did not file the tariff, and he stated that he could not recall who would have filed it.  Guillet therefore does not have personal knowledge regarding whether Connect's interstate tariff was filed with the FCC.

Connect also argues that Qwest's Director of Facility Costs, Chris Inman ("Inman"), acknowledged that Connect filed an interstate tariff with the FCC.  The evidence that Connect cites in support consists of an email exchange between Wrobel and Inman.  In it, Inman states in response to receiving the interstate tariff produced by Wrobel on behalf of Connect that "[t]here is only one FCC tariff included [in Wrobel's email] and that is for Connect [] and it wasn't filed until May 2008."  P. Conf. App. 70.  Although when read in isolation Inman appears to admit that the tariff was filed with the FCC, a reasonable trier of fact could only find, in the context of the entire email exchange, that Inman was merely acknowledging the receipt of an interstate tariff *that stated* that it was filed with the FCC. *See* P. Conf. App. 69-71.  Inman's statement would not enable a reasonable trier of fact to find that the tariff was in fact filed with the FCC.

If uncontested by Connect, Wrobel's statement that Connect did not have an FCC tariff, in tandem with Qwest's evidence that the FCC does not have such a tariff on file, is sufficient proof to establish beyond peradventure that Connect did not file an interstate tariff with the FCC.  Connect has adduced no evidence that the tariff it produced to Qwest was filed with the FCC.  The only relevant summary judgment proof that Connect offers is a copy

of the interstate tariff that it purportedly filed with the FCC. The existence of the interstate tariff alone, however, would not enable a reasonable trier of fact to find that the tariff was *filed with the FCC*. The remaining evidence that Connect relies on consists of speculative statements made by Wrobel and Guillet without personal knowledge, and statements of Inman that, when read in proper context, are not evidence or a concession that the interstate tariff was filed. Moreover, Connect's attempts to dispute Qwest's affirmative evidence that no interstate tariff was filed with the FCC, *see supra* note 10, also fail. Qwest has therefore established beyond peradventure that Connect did not file its interstate tariff with the FCC.

C

Connect advances various arguments to support the contention that it need not have filed an interstate tariff with the FCC to have billed Qwest for the disputed charges.

Connect maintains that Qwest did not follow the procedure for disputing an invoice set forth in its interstate tariff. But Qwest's evidence has shown that the interstate tariff was not filed and is therefore inapplicable; thus Connect's argument that Qwest did not follow various provisions of the tariff does not rebut Qwest's showing that the interstate tariff was not filed and is unenforceable.

Connect next posits that, regardless whether the interstate tariff was filed, the constructive ordering doctrine requires that Qwest pay for the switched access charges that Connect billed. Under the constructive ordering doctrine, a company may be deemed to have ordered services pursuant to a tariff even if it did not affirmatively order them. *See Alliance Commc'ns Co-op., Inc. v. Global Crossing Telecomms., Inc.*, 663 F.Supp.2d 807, 820-21

(D.S.D. 2009) ("The constructive ordering doctrine . . . has been applied in several cases to find an entity potentially liable for charges under a tariff even when it did not order services as proscribed in the tariff."). "[F]or a party to be deemed to have constructively ordered services, it must have actually received the services offered under the applicable tariff." *Id.* at 821; *see also Advamtel, LLC v. AT&T Corp.*, 118 F.Supp.2d 680, 686 (E.D. Va. 2000) (holding that in suit "to recover the tariff rates for the services already provided[,] [t]he constructive ordering doctrine . . . ensur[es] equal payment of the tariff rate when one receives services pursuant to a *filed* tariff") (emphasis added). Because the constructive ordering doctrine only applies when a party constructively orders services pursuant to a filed tariff, Connect cannot rely on the doctrine to charge Qwest for services where, as here, the tariff on which it relies was not filed.

Finally, Connect disputes whether it was required to file its interstate tariff with the FCC to collect switched access charges and database query charges from Qwest. Connect cites 47 C.F.R. § 61.26 for the proposition that it need not file an interstate tariff with the FCC. Section 61.26, however, prohibits CLECs from filing a tariff for their interstate switched access services that charges above certain rates. This does not mean, however, that a CLEC can charge for switched access services without a filed tariff or a negotiated contract. As discussed above, a CLEC such as Connect can only charge for switched access services pursuant to a tariff filed with the FCC or a negotiated contract. *See N. Valley II*, 26 F.C.C.R. at 10782. Section 61.26 therefore requires CLECs to negotiate contracts with IXCs if they desire to charge above certain rates. *See N. Valley II*, 26 F.C.C.R. at 10782 ("If a

- 12 -

CLEC wishes to impose higher rates [than the benchmark], it may do so only by negotiating with the affected IXCs."). Connect admits that neither it nor its agents negotiated a contract with Qwest. Connect may therefore only bill Qwest for switched access charges pursuant to a valid tariff.

## D

Qwest has established beyond peradventure that Connect did not have an interstate tariff on file with the FCC, yet charged Qwest for interstate switched access services. FCC regulations require Connect to have an interstate switched access tariff on file with the FCC or a negotiated contract with Qwest to charge it for switched access services. Charging for switched access services without a filed interstate tariff or negotiated contract constitutes an unjust and unreasonable charge under § 201(b).[13] The court therefore grants Qwest's motion for summary judgment on its § 201(b) counterclaim as to liability based on interstate calls.[14]

## E

Qwest also moves for summary judgment on its claim for damages caused by Connect's violation of § 201(b). According to Inman, Connect owes Qwest a cash

---

[13]The evidence demonstrates, and the parties do no contest, that the charges at issue were in connection with a communication service, as required to find a violation of § 201(b).

[14]Because the court is granting Qwest's motion for summary judgment on its § 201(b) counterclaim, it need not reach Qwest's other arguments supporting summary judgment on this counterclaim. Furthermore, the court need not reach Qwest's second counterclaim seeking damages for a violation of § 203(c) because Qwest is seeking the same damages for the two counterclaims.

repayment of $289,222.82 plus interest and a bill credit of $279,056.02.[15] Connect disputes Qwest's calculation of damages.[16]   The court need not reach Connect's arguments, however, because it has granted summary judgment only as to interstate calls.  Because Qwest has not provided evidence that establishes its damages based only on interstate calls, Qwest cannot establish beyond peradventure the damages to which it is entitled.   Qwest's motion for summary judgment as to damages is therefore denied.

F

Qwest moves for attorney's fees under 47 U.S.C. § 206.  Section 206 provides that "[i]n case any common carrier shall do . . . any act, matter, or thing in this chapter prohibited or declared to be unlawful . . . such common carrier shall be liable . . . [for] a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery[.]"  Because § 206 makes the award of attorney's fees mandatory in every case of recovery, Qwest is entitled to attorney's fees for Connect's violation of § 201(b).   Qwest may make a post-judgment motion for such an award.  *See, e.g., Wachovia Bank, Nat'l Ass'n v. Schlegel*, 2010 WL 2671316, at *1 n.1 (N.D. Tex. June 30, 2010) (Fitzwater, C.J.) ("[A]n attorney's fee award is typically made in response to a post-judgment Fed. R. Civ. P. 54(d) motion.").

---

[15]Because the court is denying Qwest's motion for summary judgment as to damages, it need not address Connect's objections to Qwest's evidence related to damages.

[16]Connect argues that toll-free database queries do not fall within switched access service and therefore must be paid regardless whether Connect could properly charge Qwest for switched access service.  Both the unfiled interstate and filed intrastate tariffs produced by Connect, however, include toll-free query charges as an element of switched access services.

IV

Qwest also seeks summary judgment establishing its counterclaim for breach of contract.

A

Under Texas law, a party must prove the following elements to establish a breach of contract: "(1) the existence of a valid contract; (2) that [the plaintiff] performed his duties under the contract; (3) that [the defendant] breached the contract; and (4) that [the plaintiff] suffered damages as a result of the breach." *Safeco Ins. Co. of Ind. v. Hiles*, 2011 WL 3500998, at *4 (N.D. Tex. Aug. 9, 2011) (Fitzwater, C.J.) (citing *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003)). Qwest alleges that Connect breached the terms of its intrastate tariff[17]—which serves as a contract[18] between Qwest and Connect—by charging for intrastate calls that did not involve an end user, as required by the terms of the intrastate tariff.[19]

_____

[17]The parties do not dispute that Connect properly filed an intrastate tariff with the Texas Public Utility Commission.

[18]Although a filed tariff "is not a mere contract . . . [but] is the law," *Carter v. American Telephone and Telegraph Co.*, 365 F.2d 486, 496 (5th Cir. 1966), courts permit a party to sue for breach of contract when another party violates the terms of a filed tariff. *See, e.g., Am. Tel. & Tel. Co. v. MCI Planners, Inc.*, 47 F.3d 427, *4 (5th Cir. 1995) (unpublished table decision) ("The F.C.C. tariff placed mandatory reciprocal obligations on both AT & T and Planners. This relationship has been found to give rise to a breach of contract claim."); *MCI Worldcom Commc'ns, Inc. v. LD Wholesale, Inc.*, 161 Fed. Appx. 31, 32 (2d Cir. 2005) (per curiam) (affirming finding that party was liable for breach of contract for violating terms of tariff filed with FCC).

[19]The parties dispute whether Qwest can pursue a claim for breach of contract when there is a filed tariff that governs the relationship between the parties. Connect argues that

- 15 -

The tariff states, in pertinent part:

> Switched Access Service, which is available to Customer for their use in furnishing their services to end users, provides a two-point communications path between a Customer's Premises and an End User's Premises . . . . Switched Access Service provides the ability to coordinate calls from an End User's Premises to a Customer's Premises.

P. App. 101.[20]  Any charges for switched access service must therefore include originating or terminating calls with an end user.  The intrastate tariff defines an end user as "[a]ny individual association, corporation, governmental agency or any other entity other than an Interexchange Carrier which subscribes to intrastate service provided by an Exchange Carrier."  *Id.* at 65.

---

the filed rate doctrine precludes a party from bringing a breach of contract suit.  *See Sw. Elec. Power v. Grant*, 73 S.W.3d 211, 217 (Tex. 2002) (citing *AT & T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 227 (1998)) ("[T]he filed-rate doctrine prohibits a customer from suing a utility in contract or tort over issues that a publicly-filed tariff's terms govern.").  Although styled as a breach of contract claim, Connect's claim can also be treated as an action for breach of tariff.  The filed rate doctrine does not preclude claims alleging breach of the tariff.  *See supra* note 18.  Instead, the doctrine precludes claims seeking to enforce *other* contracts that contradict the terms of a filed tariff.  *See id.* ("[U]nder the filed-rate doctrine, regulated utilities cannot vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those properly filed with the appropriate regulatory authority . . . .  [A]ggrieved customers cannot enforce alleged rights that contradict the tariff's provisions").  Thus the filed rate doctrine does not preclude a breach of contract claim when the "contract" at issue is the filed tariff itself.

[20]Connect objects to Qwest's citations to the intrastate tariff on the grounds that the tariff that Qwest cites is not the applicable tariff during the relevant time.  Connect's intrastate tariff was revised at least twice.  Connect does not argue, however, that the revisions affect the portions of the tariff that are material here.

B

Qwest argues that it has established beyond peradventure that the disputed calls did not involve an end user because the two entities that Connect contends were the end users—List Source and Protégé Services[21]—were not customers of Connect's and did not subscribe to Connect's intrastate services.  First, Qwest posits that the contract between Connect and CIT proves that List Source and Protégé Services were CIT's subscribers rather than Connect's subscribers.  Second, Qwest contends that, even if the contract between Connect and CIT does not foreclose CIT's customers from being Connect's end users, there is no evidence that List Source or Protégé Services ever paid, or was billed, for services received from Connect.  Connect responds that the contract between Connect and CIT does not determine whether Connect had end users under the intrastate tariff, and it argues that List Source and Protégé Services did subscribe to Connect's intrastate services.

1

Qwest argues that the contract between Connect and CIT proves that List Source and Protégé Services were not Connect's customers or subscribers.  Under the contract, CIT purchased local exchange services from Connect, including telephone numbers that CIT could "resell to [CIT's] subscribers."  D. App. 670.  CIT retained "all End User Customer Line Fees and Primary Interexchange Carrier Fees collected from their subscribers minus any

---

[21]Qwest has produced evidence that Protégé Services is associated with an entity called "A Concerned Citizen."  By referring only to Protégé Services, the court is not excluding relevant evidence related to "A Concerned Citizen," where applicable.

fees due [Connect]." *Id.* at 671. CIT was to bill its customers for the switched access charges they generated and pay Connect 5% of those charges and an additional fee of $1 per access line per month.

Qwest argues that because the contract defines CIT's customers as CIT's subscribers rather than Connect's subscribers, and CIT billed these subscribers, List Source and Protégé Services could not have been Connect's end users, as defined by the intrastate tariff. Connect offers several arguments in response regarding why the contract between it and CIT does not foreclose List Source and Protégé Services from qualifying as Connect's end users. Connect maintains that the intrastate tariff, not the contract between it and CIT, determines whether List Source and Protégé Services were Connect's end users. Thus even though the contract refers to the subscribers as CIT's, this does not necessarily mean that they did not subscribe to Connect's services according to the tariff, and therefore qualify as Connect's end users. Furthermore, under the terms of the contract, all of CIT's end user agreements are required to state that CIT is acting as Connect's agent. The contract also makes clear that CIT is reselling Connect's telephone numbers to CIT's subscribers, who use Connect's platform. This is explicitly permitted by Connect's intrastate tariff. *See* P. App. 69 ("[Connect] may offer [switched access] service[] over its own or resold facilities."). Connect therefore argues that CIT, as its agent, solicited its own customers, who were also Connect's end users.

The court holds that the contract between Connect and CIT does not foreclose the possibility that List Source and Protégé Services qualify as end users, according to the

intrastate tariff, by subscribing to Connect's services.  Although the contract states that the customers are CIT's subscribers, rather than Connect's subscribers, this does not necessarily mean that List Source and Protégé Services were not Connect's subscribers for purposes of the tariff.  For example, List Source and Protégé Services could have been referred to as CIT's subscribers under the contract, but, as part of their agreement with CIT, could have subscribed to Connect's intrastate service, thus making them one of Connect's end users, as defined by the intrastate tariff.

2

Qwest argues that even if the contract allowed CIT to bill customers on behalf of Connect, the evidence establishes that List Source and Protégé Services were not Connect's subscribers.  First, Guillet testified that List Source and Protégé Services were not Connect's customers, and he was unsure whether they were CIT's customers.  He also stated that Connect does not have any customers.  Second, Guillet testified that Connect never billed List Source or Protégé Services for any services under its intrastate tariff, and neither he nor Wrobel had any evidence that either purchased local exchange services from Connect.  Third, citing access line count reports from the Texas Public Utility Commission ("PUC"),[22] Qwest argues that Connect could not have considered the lines assigned to List Source and Protégé

---

[22]Connect objects to the line reports, arguing that they are not authenticated.  The court disagrees.  A document can be authenticated by circumstantial evidence, "including the document's own distinctive characteristics and the circumstances surrounding its discovery." *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (citations omitted).  The fact that Connect produced these documents, with the exhibit label attached, and the documents appear to be reports made by the PUC, is sufficient to authenticate the documents.

Services as its lines.   The access line count reports show that 19 Connect lines were associated with Harlingen, Texas, where List Source was located.   AT&T records, however, show that AT&T attributed more than 19 telephone numbers to List Source in Harlingen on lines controlled by Connect.[23]   Guillet did not know whether the lines associated with List Source in Harlingen were reported to the PUC as Connect access lines.

Connect contends that, although Guillet stated that Connect does not have any customers, he clarified this testimony in a subsequent deposition.[24]   Guillet explained that, when he testified that Connect did not have any customers, he was using the word "customer" in the business sense of the word, i.e., that List Source and Protégé Services were CIT's customers rather than Connect's because they interacted with and were billed by CIT. As CIT's customers, however, List Source and Protégé Services were using Connect's

_____

[23]Connect objects to the admissibility of the AT&T records on the grounds that they are hearsay, not authenticated, and Qwest did not offer the testimony of a person whose testimony would enable the documents to qualify under the Fed. R. Evid. 803(6) hearsay exception.   The court disagrees.   The documents have been adequately authenticated by the declaration of Keith Douglas.   *See* D. App. 668-69.   And the documents are not hearsay because they are either operative facts (i.e., contracts that are not offered for the truth of the matters asserted in the documents) or they qualify as business records of Southwestern Bell Telephone Company.

[24]The Fifth Circuit had held that a party "may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation." *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000).   Applying this principle to deposition testimony that contradicts prior deposition testimony, the court holds that Guillet has presented a sufficient explanation for the potentially contradictory testimony: that the word "customer" has multiple meanings, and when he testified that Connect has no customers, he only meant that it had no customers in the business sense rather than as defined by the intrastate tariff.

telephone lines and were Connect's end users.  Furthermore, as Connect's agent, CIT had the authority to provision services from AT&T on behalf of Connect.[25]  Connect therefore argues that a customer of CIT could have been Connect's end user.

Qwest next argues that, even if Guillet's clarified testimony is accepted, there is no evidence that List Source or Protégé Services was ever billed, or paid, for CIT's or Connect's services, proving that neither was Connect's subscriber.  Connect responds by pointing to four invoices[26] that CIT submitted to List Source that charged List Source for service.[27]  Guillet also testified that he knew CIT disconnected customers who were not paying their bills, and because CIT did not disconnect List Source or Protégé Services, they must have been paying their bills.

Qwest attempts to discount the four invoices in several ways.  First, Qwest points to the absence of evidence that CIT sent the invoices to List Source, that the invoices were

_____

[25]Both parties made numerous form and foundation objections throughout the depositions.  These objections were required, of course, in order that they were not waived.  *See* Rule 32(d)(3)(B)(i) (providing that error or irregularity at oral examination is waived if, *inter alia*, it relates to form of question or answer and objection is not timely made during deposition).  But unless such an objection was renewed or clearly adopted in the summary judgment briefing, the court has assumed that the party making the objection did not intend to preserve it with regard to Qwest's summary judgment motion.

[26]Connect objects to the four invoices on the ground that they have not been authenticated.  The court disagrees.  Connect produced these four invoices with its exhibit label attached, and they appear to be invoices sent by CIT to List Source.  Thus, for the same reasons set forth *supra* at note 22, the court concludes that these documents have been properly authenticated.

[27]CIT's principal, Craig Bolin, testified that the only documents he could find related to CIT were these four invoices.

contemporaneously created, or that List Source paid the invoices.  Second, the address on the List Source bills is a Fort Worth, Texas address that Connect identified as Protégé Services' address.  Third, the bills do not identify any end user customer line fees, and the rate charged ($30 per month per line) is not a rate for any service offered under Connect's intrastate tariff.

## C

The court holds that Qwest has failed to meet its heavy burden of establishing beyond peradventure that List Source and Protégé Services did not subscribe to Connect's services through CIT.  Guillet's testimony, in conjunction with the four List Source invoices, creates a genuine issue of material fact concerning whether List Source and Protégé Services subscribed to Connect's intrastate services through CIT.  Despite the apparent inaccuracies in the four List Source invoices produced by Connect, Qwest has failed to exclude the possibility that the invoices are what they purport to be.  The contract between Connect and CIT, as further explained by Guillet, allows CIT to offer Connect's services to CIT's customers.  Guillet testified that List Source and Protégé Services paid for such services, and the four invoices corroborate this testimony.  Drawing all inferences in favor of Connect as the nonmoving party, the court concludes that a reasonable jury could find that List Source and Protégé Services subscribed to Connect's services through CIT and therefore are Connect's end users.  The court denies Qwest's motion for summary judgment on its breach of contract counterclaim.

V

Qwest moves for summary judgment on its counterclaim for unjust enrichment and money had and received.

"Unjust enrichment 'is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay.'" *Redwood Resort Props., LLC v. Holmes Co.*, 2006 WL 3531422, at *9 (N.D. Tex. Nov. 27, 2006) (Fitzwater, C.J.) (quoting *Doss v. Homecoming Fin. Network, Inc.*, 210 S.W.3d 706, 709 n.4 (Tex. App. 2006, pet. denied)). Thus the court will not address Qwest's counterclaim for unjust enrichment and money had and received as two distinct claims, but will instead address only the counterclaim for money had and received.

To succeed on its money had and received counterclaim, Qwest must establish that Connect "holds money which in equity and good conscience belongs to [Qwest]." *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004). Qwest argues that, because Connect billed Qwest for intrastate charges that it had no legal basis to charge, but that Qwest in part paid, Connect took undue advantage of Qwest and holds money that in equity and good conscience belongs to Qwest.[28] To prove this counterclaim, Qwest relies on the same evidence on which it relied to prove its counterclaims based in law. As the court has

---

[28]Qwest only seeks relief under these equitable counterclaims to the extent the court denies relief on the other counterclaims. Because the court is granting Qwest's motion for summary judgment on its § 201(b) counterclaim, thereby entitling Qwest to recover damages for interstate calls, the court need only address these claims as they pertain to intrastate calls.

already held, there is a genuine issue of material fact concerning whether Connect's intrastate

tariff provided a legal basis to charge Qwest for the intrastate calls made by List Source and

Protégé Services.  Thus for the reasons explained above, the court denies Qwest's motion for

summary judgment on its equitable counterclaims.[29]

## VI

Qwest also moves for summary judgment on its declaratory judgment counterclaim.

Federal courts have broad discretion to grant or refuse declaratory judgment.  *See*

*Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).  "Since its inception, the

Declaratory Judgment Act has been understood to confer on federal courts unique and

substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven*

*Falls Co.*, 515 U.S. 277, 286 (1995).  It gives federal courts the competence to declare rights,

but it does not impose a duty to do so.  *See Public Affairs Assocs. v. Rickover*, 369 U.S. 111,

112 (1962) (per curiam).  A declaratory judgment action is merely a vehicle that allows a

party to obtain "early adjudication of an actual controversy."   *Collin Cnty., Tex. v.*

*Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170 (5th Cir.

1990).  Its purpose is to allow "parties [to] avoid damages that might otherwise accrue." *Id.*

at 172 (citation omitted).  This court has previously declined in its discretion to enter

declaratory judgments when parties have sought to remedy past wrongs or to seek

---

[29]Because the court is denying Qwest's motion for summary judgment on its equitable counterclaims, it need not reach Connect's argument that the filed rate doctrine precludes Qwest from bringing the equitable counterclaims.

declarations that duplicate other claims. *See Garcia v. Bank of N. Y. Mellon*, 2012 WL 692099, at *4 (N.D. Tex. Mar. 5, 2012) (Fitzwater, C.J.) (declining to grant declaratory relief because "[p]laintiffs are not attempting by their declaratory judgment action to help the parties avoid damages that might otherwise accrue[,] . . . [t]hey are [instead] essentially seeking a remedy for a past alleged wrong."); *Assisted, Inc. v. Conceptual Health Solutions, Inc.*, 2006 WL 3691003, at *17-18 (N.D. Tex. Dec. 14, 2006) (Fitzwater, J.) (declining to grant declaratory relief on issues that would be decided in context of party's breach of contract claim).

Based on the facts supporting its other counterclaims, Qwest asks the court to make the following declarations: (1) Qwest is not responsible for paying the database query charges billed by CIT; (2) the entities generating the billed-for traffic are not Qwest's end users, as defined by Connect's tariffs; (3) the entities generating the billed-for traffic did not subscribe to Connect's tariffs; (4) Connect violated Texas law by using autodialing equipment that is not registered with the PUC; and (5) Qwest has no obligation under the Communications Act to accept Connect's toll-free origination traffic generated by autodialing. The first three requests ask the court to declare certain relief that has already been determined *supra* in the context of other claims. The fourth request would also have been determined in the context of Qwest's § 201(b) claim, but because the court granted Qwest summary judgment on its § 201(b) claim on other grounds, the court did not reach whether the traffic at issue was generated by autodialers. Moreover, the fourth request essentially seeks a remedy for a past wrong. Although the fifth request seeks relief that may

allow Qwest to avoid claims that might otherwise accrue, Qwest provides no basis for the

court to grant summary judgment other than based on a citation to a single case that stands

for the proposition that "where a CLEC is irrelevant to the ubiquity and seamlessness of the

nation's telecommunications network, the IXC need not purchase its services." *Hypercube*,

2009 WL 3075208, at *6.  Even assuming *arguendo* that some of Connect's end users are

autodialers, this does not establish beyond peradventure that Connect is irrelevant to the

ubiquity and seamlessness of the nation's telecommunications network.  Moreover, if Qwest

could "identify other reasons for the court to resolve this issue by declaratory judgment, it

did not adequately brief them." *Assistmed*, 2006 WL 3691003, at *18.

Qwest's motion for summary judgment on its declaratory judgment counterclaim is

denied.

## VII

The court now considers the part of Qwest's motion for summary judgment that is

addressed to Connect's claims.  The court will address together Connect's claims for breach

of contract and violations of the filed rate doctrine.

## A

Under Texas law, a party must prove the following elements to establish a breach of

contract: "(1) the existence of a valid contract; (2) that [the plaintiff] performed his duties

under the contract; (3) that [the defendant] breached the contract; and (4) that [the plaintiff]

suffered damages as a result of the breach." *Hiles*, 2011 WL 3500998, at *4.  The filed rate

doctrine holds that "a tariff filed with and approved by an administrative agency under a

statutory scheme is presumed reasonable unless a litigant proves otherwise." *Mid-Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 625 (Tex. 2007). "[F]iled tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside." *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 217 (Tex. 2002). Thus "regulated utilities cannot vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those properly filed with the appropriate regulatory authority." *Id.* Because "a utility's obligations to its customers cannot exceed its duties under a filed tariff . . . aggrieved customers cannot enforce alleged rights that contradict the tariff's provisions." *Id.*

Connect asserts a violation of the filed rate doctrine as a basis for relief that is distinct from its breach of contract claim. The filed rate doctrine, however, does not provide a basis for a claim; instead, it is a doctrine that establishes that a filed tariff definitively governs a utility's[30] relationship with its customers. *See id.* The allegations on which Connect relies to support its claim for a violation of the filed rate doctrine demonstrate that Connect is seeking payment under the terms of the tariff. Such relief is properly sought pursuant to Connect's breach of contract claim rather than through a distinct claim that Qwest violated the filed rate doctrine. The court will therefore address the filed rate doctrine only to the extent that it is relevant to Connect's breach of contract claim.

---

[30]The filed rate doctrine also applies in contexts that do not involve utilities.

B

Connect argues that Qwest breached Connect's interstate and intrastate tariffs by using Connect's switched access services without paying for them. The court has held above that Qwest has established beyond peradventure that Connect did not file its interstate tariff; thus Connect cannot prove the existence of a valid tariff or contract covering the disputed interstate calls. The court therefore grants Qwest's motion for summary judgment on Connect's breach of contract claim alleging that Qwest breached the interstate tariff.

C

Qwest seeks summary judgment on the part of Connect's breach of contract claim that alleges that Qwest breached the intrastate tariff. As also explained above, Qwest maintains that Connect could not charge Qwest for switched access services under the intrastate tariff because the calls at issue did not involve end users. Consequently, Qwest argues, Connect cannot prove that Qwest breached the contract by failing to pay for services rendered because the services at issue were not offered in accordance with the terms of the intrastate tariff.

The court has already held above, however, that Connect's evidence is sufficient to create a genuine issue of material fact concerning whether the calls at issue involved end users and therefore were properly charged to Qwest under the tariff. The court therefore denies Qwest's motion for summary judgment on Connect's breach of contract claim based on the intrastate tariff.

VIII

Qwest moves for summary judgment as to Connect's equitable claims of unjust enrichment, money had and received, and quantum meruit.

Before reaching the merits of Connect's equitable claims, the court must address Qwest's contention that the claims are preempted by the federal regulatory regime. The Fifth Circuit has held that, "[u]nder the filed-rate doctrine, federal law preempts claims concerning the price at which service is to be offered[, and] . . . claims concerning the services that are offered." *Access Telecom, Inc. v. MCI Telecomm.*, 197 F.3d 694, 711 (5th Cir. 1999) (citing *AT&T v. Cent. Office Tele., Inc.*, 524 U.S. 214, 220-225 (1998)). If the additional claims "concern the provision of services which are covered by the filed tariff," the filed rate doctrine preempts Connect's claims. *Id.* (holding that filed rate doctrine did not preempt tortious interference claim because "[i]t does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not derivative of any phone services"). Courts that deem equitable claims to be preempted often base the conclusion on the existence of an applicable tariff. *See, e.g., MCI WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc.*, 2005 WL 2145499, at *5 (E.D. Va. Aug. 31, 2005) (citing *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1170 (9th Cir. 2002)) (granting summary judgment on quantum meruit and unjust enrichment claims because filed tariff doctrine precluded "any claim that would allow Paetec to charge MCI outside the tariff"). The parties do not dispute that the intrastate tariff was properly filed. The filed rate doctrine therefore prohibits Connect from asserting equitable claims

against Qwest that essentially seek to enforce the provisions of the intrastate tariff.  *See Access Telecom*, 197 F.3d at 711; *see also Grant*, 73 S.W.3d at 217.  Because Connect's equitable claims seek damages for services provided under the tariff, the filed rate doctrine bars the equitable claims.  The court therefore grants Qwest's motion for summary judgment on Connect's equitable claims to the extent they seek damages for intrastate calls.

The parties dispute whether equitable claims are permitted when there is no filed tariff or negotiated contract.  This dispute is related to the interstate calls at issue.  Federal law required Connect to file a tariff or negotiate a contract with Qwest in order to charge Qwest for telecommunications services.  *See N. Valley II*, 26 F.C.C.R. at 10782.  Because Connect did not file an interstate tariff or negotiate a contract with Qwest, Connect cannot charge Qwest for interstate services.  Connect cannot circumvent this prohibition by relying on equitable theories of recovery.  The court therefore grants Qwest's motion for summary judgment on Connect's equitable claims pertaining to the interstate calls.

IX

Qwest moves for summary judgment dismissing Connect's conversion claim.  Qwest argues, *inter alia*, that the conversion claim is preempted by the federal regulatory regime.

The court concludes for the reasons explained in § VIII concerning Connect's equitable claims that Connect's conversion claim is barred.

- 30 -

X

Qwest moves for summary judgment as to Connect's claims under the Texas Public

Utility Regulatory Act ("PURA") and federal law.

A

Connect argues that Qwest violated Tex. Utilities Code Ann. §§ 53.003,[31] 55.005, and

55.006 (West 2007) by impermissibly discriminating against Connect by paying for services

rendered by other CLECs while refusing to pay Connect.  Qwest argues that none of the

statutes cited by Connect applies to Qwest.

Section 53.003(b) prohibits public utilities from charging "unreasonably preferential,

prejudicial, or discriminatory" rates to "each class of consumer[,]" and § 55.005 prohibits

public utilities from granting unreasonable advantages or disadvantages "[i]n providing a

service to persons in a classification[.]"  Sections 53.003 and 55.005 therefore apply only to

carriers.  Connect alleges that Qwest discriminated against Connect by refusing to pay its

bills in Qwest's role as Connect's *customer*, not in its role as a *service provider*.

Connect also fails to adduce evidence that supports the conclusion that § 55.006

applies to Qwest.  Section 55.006 prohibits discrimination against a person "in competition

with the public utility[.]"  Connect argues that Qwest is its competitor because it operates as

a CLEC in the state of Texas.  The only supporting evidence that Connect offers are portions

---

[31]The court, like Qwest, assumes that Connect intended to cite § 53.003 rather than § 55.003, since § 53.003 relates to the arguments related to discrimination set forth by Connect.  Additionally, Connect asserts a claim under § 52.15 of PURA, but PURA does not include a § 52.15.

of two Qwest tariffs.  The two tariffs, however, demonstrate that Qwest offers services as an

IXC, not a CLEC.  Because Qwest has pointed to the absence of evidence that §§ 53.003,

55.005, and 55.006 apply to Qwest, and Connect has failed to produce evidence sufficient

to create a genuine issue of material fact as to whether they do, the court grants Qwest's

motion for summary judgment as to all Connect's claims under PURA.

## B

Connect alleges that Qwest discriminated against it and engaged in practices that

restrict competition in violation of "applicable federal statutes."  Am. Compl. 7.  Although

Connect does not identify in its amended complaint or response brief the federal statutes

under which it intends to hold Qwest liable, in an interrogatory answer Connect identifies §§

201(b), 203(c), and 204(a)(3) of the Communications Act as the applicable federal statutes.

Qwest argues that it is entitled to summary judgment because a carrier cannot sue a customer

for violations of the Communications Act.

In *All American Telephone Co. v. E-Pinnacle Communications*, 26 F.C.C.R. 723

(2011), the FCC made clear that the Communications Act "generally governs a carrier's

obligations to its customers, and not vice versa."  *Id.* at 727.  The FCC therefore "has

repeatedly held that an allegation by a carrier that a customer has failed to pay charges

specified in the carrier's tariff fails to state a claim for violation of any provision of the Act,

including sections 201(b) and 203(c)—even if the carrier's customer is another carrier."  *Id.*;

*see also N. Valley Commc'ns, LLC v. Qwest Commc'ns Co.*, 2012 WL 523683, at *7 (D.S.D.

Feb. 16, 2012) (applying *Chevron* deference to and following *All American Telephone* in

dismissing carrier's claims under Communications Act against its customer).   Although Connect alleges that Qwest violated the Communications Act by refusing to pay Connect while paying other CLECs, Connect's claim is essentially a collection action, because Connect seeks damages in the total amount of tariffed charges it is allegedly owed in accordance with its tariff.  Because such a claim is not cognizable under the Communications Act, the court grants Qwest's motion for summary judgment on Connect's claims under the Communications Act.

XI

Qwest moves for summary judgment on Connect's request for attorney's fees under Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 2008).   Qwest argues that because Connect cannot prevail on its breach of contract claim, it cannot recover attorney's fees. Because the court has denied in part Qwest's motion for summary judgment on Connect's breach of contract claim, Connect may be able to demonstrate that it is entitled to attorney's fees.  The court therefore denies Qwest's motion for summary judgment in this respect.

XII

Qwest moves for summary judgment as to Connect's request for exemplary damages. Exemplary damages are available only if Connect proves "actual damages sustained from a tort." *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995).  Because Connect does not assert a tort claim and therefore cannot recover exemplary damages as a matter of law, the court grants Qwest's motion for summary judgment as to Connect's request for exemplary damages. *See Girma v. Compass Bank*, 2006 WL 1499983, at *7 (N.D. Tex. May

31, 2006) (Fitzwater, J.) (granting defendant summary judgment on plaintiff's request for exemplary damages because plaintiff's only remaining claim was for breach of contract).

## XIII

Qwest moves for summary judgment dismissing Connect's claim for consequential damage theories based on all of the grounds asserted in its motion to strike Wrobel's expert report.  Although Wrobel has since been de-designated as an expert, the court declines to dismiss this component of Connect's damages claim, concluding that this issue is better resolved at trial.  *See* Rule 56(g) advisory committee's note (2010 amendment, subdivision (g)) ("If it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial.").

\*    \*    \*

For the reasons explained, Qwest's February 28, 2012 motion for summary judgment is granted in part and denied in part.

**SO ORDERED.**

July 23, 2012.

SIDNEY A. FITZWATER
CHIEF JUDGE

- 34 -